IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AHMAD M., ) | |
| ) | |
|     Plaintiff, ) | |
| ) | No. 19 C 515 |
| v. ) | |
| ) | Magistrate Judge Gabriel A. Fuentes |
| KILOLO KIJAKAZI, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
|     Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Ahmad M.[3] applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on October 10, 2014 when he was 52 years old, contending that he became disabled on July 1, 2013 due to diabetes, high blood pressure, neuropathy, high cholesterol,

---

[1] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On March 12, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 14) On May 31, 2019, this case was reassigned to this Court for all proceedings. (D.E. 17.)

[3] The Court in this opinion is referring to Plaintiff by his first name and first initial of his last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated.

poor circulation and suicidal thoughts. (R. 62, 67.) His date last insured was December 31, 2016. (R. 62.) After a hearing on December 29, 2017, an administrative law judge ("ALJ") issued an opinion finding that Plaintiff was not disabled. (R. 14-23.) The Appeals Council denied review of the ALJ's decision (R. 7-9), making the ALJ's decision the final decision of the Commissioner. *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Plaintiff seeks remand of the Commissioner's decision denying her application for benefits (D.E. 15), and the Commissioner has asked the Court to affirm the decision. (D.E. 23.) The matter is now fully briefed.

I. **LEGAL STANDARD**

The Court's review of the ALJ's decision is deferential; "we will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). "An ALJ need not address every piece of evidence," but must "build an accurate and logical bridge" between the evidence and her conclusion. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017). That is, the ALJ's decision will be upheld "if it is supported by substantial evidence—evidence a reasonable mind might accept as adequate to support a conclusion." *Lothridge v. Saul*, 984 F.3d 1227, 1232 (7th Cir. 2021). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations. And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019).

"To determine the credibility of allegations of disabling pain, an ALJ may consider several factors, including objective medical evidence and any inconsistencies between the allegations and the record." *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2021). "A claimant's assertions of pain, taken

alone, are not conclusive of a disability." *Id.* The Court will give the ALJ's credibility finding special deference and overturn it only if it is patently wrong. *Summers v. Berryhill,* 864 F.3d 523, 528 (7th Cir. 2017).

## II.     ADMINISTRATIVE RECORD

### A.     Medical Evidence

Plaintiff was born on January 4, 1963 and was 54 years old at the hearing. (R. 62.) He has a history of diabetes and peripheral neuropathy (tingling and pain in arms, legs, hands, and feet) dating back to 2010 (R. 67.) The evidentiary record begins in July 2012 when Plaintiff visited Cook County Health System to request diabetes medication. (R. 318-20.) The next medical record is dated April 20, 2013, when Plaintiff went to the Rush University Medical Center ("Rush") with complaints of back pain that radiated down his right leg. (R. 359.) On examination he had normal range of motion and coordination and a positive straight leg test in his right leg; his mood and affect were normal. (R. 359-62.) He was diagnosed with acute chronic sciatica and prescribed a "small amount" of pain meds. (R. 362.) Plaintiff again visited the Rush emergency department on May 3, 2013, complaining of body aches and back pain; he denied numbness or tingling in his lower extremities. (R. 364.) He had normal muscle tone and coordination, normal strength, was able to ambulate, and was assessed to have peripheral neuropathy and referred to a primary care doctor. (*Id.*) At a follow up appointment two weeks later, Plaintiff reported checking his blood sugar only rarely. (R. 365.) He was assessed as negative for muscle pain and weakness, joint pain or swelling or decreased range of motion, as well as negative for depression and anxiety; he was prescribed Gabapentin for pain due to his peripheral neuropathy. (R. 366-67.)

Plaintiff next visited the Rush emergency department on July 8, 2013, complaining of sweating and dizziness. (R. 368-69.) He had normal range of motion, normal gait, and 5/5 strength;

3

medical records from the visit contain no diagnosis or treatment plan and his physical examination was normal. (*Id.*) At an appointment on October 1, 2013 to establish care for his diabetes and prepare him for surgery for erectile dysfunction, Plaintiff's musculoskeletal and neurological systems were assessed as normal and he had 5/5 strength in his extremities.[4] (R. 372-377, 380-81.) He reported seeing a pain specialist to obtain medication for his chronic body aches. (R. 370.) Although he reported pain in his hands, legs, and lower back, Plaintiff acknowledged that he checked his blood sugar only sporadically. (R. 375.) At another appointment at Rush on October 28, 2013, Plaintiff reported being non-compliant with medication, diet, and exercise and that he did not check his blood sugar regularly. (*Id.*) He reported being able to perform all activities of daily living (ADLs) on his own. (R. 383.)[5] On examination Plaintiff was positive for neuropathy but assessed to have no neurological deficits. He was told to continue taking Gabapentin and counseled about improving his diet and exercise by meeting with a dietician and beginning karate. (R. 377-78.)

Aside from records regarding Plaintiff's erectile dysfunction surgery in December 2013, the record is quiet again until February 5, 2015, when Plaintiff underwent a consultative psychiatric examination in connection with his application for benefits. (R. 541.) Dr. Ana Gil noted that Plaintiff's mood was "sad, tearful, restricted, [and] appropriate" and that he had mild psychomotor agitation; she diagnosed him with moderately severe depressive disorder. (R. 544.)

---

[4] Plaintiff underwent penile implant surgery on December 8, 2021. (R. 389.). While medical records indicate that he had mild gastrointestinal complications after surgery, there is no evidence of problems related to Plaintiff's peripheral neuropathy, diabetes, or mental health.

[5] The medical record contains a few pages of handwritten progress notes from the 11th Street Medical Center dated from 9/20/14 to 3/26/15. (R. 553-561.) The notes are nearly illegible and neither Plaintiff nor the ALJ cites to them.

4

Dr. Gil's examination notes reflect that no previous psychiatric records were available[6] and that Plaintiff had no history of psychiatric hospitalization, racing thoughts, periods of hyperactivity or feelings of euphoria. (R. 541.) She found no evidence of psychosis or thought process disorder. (R. 544.)

Thereafter, on March 31, 2015, Plaintiff underwent a physical consultative examination. (R. 548.) Liana Palacci, D.O., reviewed Plaintiff's medical records and assessed him as having normal lower and upper extremity strength and normal range of motion. (R. 550.) She noted that Plaintiff was able to make fists and oppose fingers, heel-to-toe walk, squat, and walk normally. (*Id.*) She diagnosed Plaintiff with poorly controlled diabetes, history of erectile dysfunction and well-controlled hypertension. (R. 551.)

The next medical record is dated July 8, 2016, when Plaintiff visited Cook County Health Systems complaining of a toothache. (R. 582.) On physical examination he had normal range of motion, strength, and coordination and was negative for any psychiatric issues. Plaintiff subsequently received treatment for his dental issue. (R. 589.)

On February 9, 2017, Plaintiff visited the Christian Community Health Center complaining of abdominal pain, resulting in a C/T scan of his abdomen. (R. 656.) He returned the next day for a follow up appointment also complaining of neuropathy related to his diabetes. (R. 661.) Physician's assistant ("PA") Dannon Martin assessed Plaintiff as having numbness in his extremities and told him to continue taking Gabapentin for pain. (R. 661, 664.) A psychiatric assessment was negative for anxiety and depression and a diabetic foot screen was normal. (*Id.*)

On March 9, 2017, Plaintiff had a behavioral health appointment at the Christian Community Health Center. (R. 642-655.) He reported that he had a previous diagnosis of

---

[6] There is no evidence that previous psychiatric records exist.

depression in adulthood and that he had a history of "feeling bipolar" and feeling anxious but he did not know if he had ever been diagnosed with any mental health issue. (R. 645.) He was evaluated as feeling stressed and anxious about his unstable housing, distressed relationships with his children, financial problems, and illiteracy. *Id.* Plaintiff was assessed as likely benefitting from monthly or bi-monthly counseling sessions and was given a follow up appointment for mental health treatment but there is no evidence that one occurred.

### B. Medical Opinions

The medical record contains three opinions. An April 30, 2015 evaluation by the Commission determined that Plaintiff's impairments were non-severe based on his mostly normal consultative examination, mild restrictions on his ability to perform ADLs, and the fact that his diagnosis of depression was found to be situational and secondary to his physical limitations. (R. 69-70.) A second Agency opinion dated August 24, 2015 concurred that Plaintiff was not disabled, based on the "location, duration, frequency and intensity" of Plaintiff's pain and symptoms. (R. 94.) On September 11, 2017, PA Martin completed a residual functional capacity ("RFC") that opined that due to his neuropathy, Plaintiff could not lift or carry more than five pounds and was unable to bend, stoop, operate foot controls, reach above shoulder level on either side, or use his hands or arms to push pull, or perform gross or fine motor manipulation. (R. 639-640.)

### C. Hearing

Plaintiff testified that he could no longer work his previous construction jobs because of his diabetes, high blood pressure, and neuropathy, and because his hands got "stuck" when he made a fist. (R. 42.) He also testified that he had constant pain in his back and within the past few months had been to the hospital for tests and had been prescribed Norco for pain. (R. 43.) He also

testified about his illiteracy, explaining that friends and coworkers helped him fill out work forms and other documents when needed. (*Id.*) Upon questioning by the ALJ, Plaintiff testified that he was able to lift five pounds, walk for a short block, and stand for 15 to 20 minutes. (R. 52-53.) He admitted taking a low dose of his sister's pain medication (Neurotin) in September 2017 when he did not have his own Gabapentin with him. (R. 49.)[7] He disagreed with medical records from 2017 that said he did not have numbness in his feet or headaches, telling the ALJ that the records were wrong and that his feet were numb every day, he had headaches and continued to have problems with his hands. (R. 48-49.) Upon questioning from his attorney, Plaintiff testified that he gets depressed because he is unable to work due to his impairments. (R. 56.) He also testified that his insurance "ran out" around 2013 and that the replacement insurance he was able to get was not accepted many places, so he was not able to continue EMG testing and treatment for his back or hands. (R. 44-45, 48.)

      A vocational expert testified that Plaintiff's previous work was at the "very heavy" and "heavy" unskilled levels. (R. 58.) When the ALJ asked about an individual who could perform medium work but needed instructions provided in a short, simple demonstration, the VE testified that Plaintiff could not perform his previous work but could work as a kitchen helper, machine packager, and conveyer feeder. (*Id.*) When the ALJ changed the hypothetical to limit work to the light level of exertion, the VE testified that available jobs included bagger, cleaner, and cafeteria attendant. (R. 59.) At the sedentary level, there were no jobs available. (*Id.*)

---

[7] The medical record concerning Plaintiff's taking his sister's medication is unclear. At the hearing, the ALJ asked claimant if he was prescribed Gabapentin in 2017 because he was complaining of pain and taking his sister's Neurontin. Claimant disagreed, testifying that one day "I didn't have my gabapentin's with me. She [his sister] had some and . . . she was just giving me 100 milligrams" when his regular dose was 1,000 milligrams three times per day. (R. 49.)

7

### D. ALJ Opinion

As relevant to the five-step process for evaluating disability, 20 C.F.R. § 404.5120(a), the ALJ found at step two that Plaintiff had the severe impairment of neuropathy, and that his impairments of diabetes, hypertension, and depressive disorder were non-severe. (R. 16-17.) As relevant to this opinion, the ALJ considered the disability regulations' four areas of mental functioning (the "Paragraph B" criteria) and determined that Plaintiff had mild limitations in understanding, remembering, or applying information, interacting with others, and concentrating, persisting, and maintaining pace, and that Plaintiff had no limitation in adapting or managing himself. (R. 17.) As support for this opinion, the ALJ noted that during medical examinations Plaintiff demonstrated appropriate mood and affect, that at Plaintiff's 2015 psychiatric consultation there were no mental health records to review, that Plaintiff had testified becoming more socially isolated and having decreased appetite, and that he was able to manage his personal care but that his siblings helped him with cooking, cleaning, laundry and driving. (*Id.*) The ALJ acknowledged Plaintiff's history of learning disabilities and reading difficulties and noted that at his psychiatric consultative examination, Plaintiff presented with mild psychomotor agitation, was restless, had a sad and tearful affect, and reported that the main stressors in his life were unstable housing, troubled relationships with his children, financial insecurity, and illiteracy, but that he did not seek mental health treatment until 2017. (*Id.*)

Next, at step three, the ALJ held that Plaintiff's neuropathy did not meet a Listing because he did not have disorganization of motor function in two extremities that caused an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use his upper extremities. In the alternative, the ALJ also found that Plaintiff did not have a marked

8

limitation in physical function combined with a marked limitation in one of the Paragraph B factors. (*Id.*)

The ALJ determined that Plaintiff had the RFC to perform medium work, with the exception that Plaintiff would need instructions provided in short, simple demonstration and that the job should not require writing. (R. 18-19.) In offering support for this RFC, the ALJ acknowledged Plaintiff's testimony that he was in too much pain to drive and that his hands become "stuck," preventing him from making a fist. (R. 19.) The ALJ also discussed Plaintiff's completion of a pain questionnaire and function report from October 2014 in which he stated that he has shooting pain throughout his body every day and that he takes prescription pain medication that relieves his pain within 15-30 minutes. (R. 19-20.) In the same questionnaire, the ALJ pointed out that Plaintiff wrote that he sees his family weekly, goes to church, and can pay attention "for hours," although he is unable to read and does not handle stress or change in routine. (R. 19.)

The ALJ then explained she determined that Plaintiff's description of his symptoms and limitations were not consistent with the medical evidence and did not preclude his ability to perform medium work despite his neuropathy. Specifically, the ALJ explained that she considered the lack of medical findings, Plaintiff's inconsistent treatment, and his non-compliance with treatment as reasons to support the RFC determination. The ALJ described Plaintiffs' medical examinations in October 2013 that demonstrated full range of motion and strength in his extremities, normal gait, and his admission that he was non-compliant with diet and exercise plans and checked his blood sugar only sporadically. (*Id.*)

With respect to the medical opinions, the ALJ gave little weight to the Agency opinions that found Plaintiff to have no severe impairments because she found that the medical evidence supported a finding that Plaintiff's neuropathy was severe enough to affect his ability to work. (R.

9

20.) The ALJ also gave little weight to PA Martin's opinion, finding that the medical records did not support such significant limitations, particularly in light of Plaintiff's non-compliance with diet, exercise, and medication, and the fact that the medical records suggest that Plaintiff's neuropathy did not become severe until 2017, when he began to complain of pain. (*Id*.)

### III.  Analysis

Plaintiff makes several arguments in favor of remand. In his initial motion for summary judgment, he contends that the ALJ erred by not finding that he meets the Listing for peripheral neuropathy and depressive disorder, and that the entire decision is unsupported by substantial evidence because the ALJ ignored Plaintiff's testimony, failed to fully develop the record, failed to give appropriate weight to Plaintiff's treating physician, failed to fully articulate her reasoning, and relied on her own unprofessional opinion. (Pl. Mot. for Sum. J. at 6-8.) In his Reply, Plaintiff additionally argues that the Commissioner violated the *Chenery* doctrine by raising for the first time the argument – not advanced by the ALJ – that PA Martin, who Plaintiff saw in 2017, was not considered a treating physician for the purpose of giving his opinion controlling weight. (Pl. Reply at 1), *citing SEC v. Chenery Corp*., 318 U.S. 80, 87-88 (1943).

Plaintiff's arguments are not well-taken and amount to little more than disagreement with the way the ALJ evaluated and weighed the evidence, determinations we will not upset on appeal. *Gedatus,* 994 F.3d at 900. In making this determination, we note that the ALJ did acknowledge nearly all the medical evidence in the record; most of Plaintiff's arguments concern how the ALJ evaluated that evidence to find him not disabled. Plaintiff bears the burden "to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting [his] capacity to work." *Weaver v. Berryhill*, 746 Fed. App'x 574, 579 (7th Cir. 2018).[8]

---

[8] Plaintiff points to a mistake the ALJ made about the number of times he attended physical therapy as evidence that the ALJ's evaluation of the evidence was not sufficient. However, the mistake at issue

A.     The Listings

We find that the ALJ's determination that Plaintiff did not meet a Listing for either peripheral neuropathy (11.14) or depressive, bipolar and related disorders (12.04) is supported by substantial evidence. Under the Social Security regulations, a claimant is eligible for disability benefits if she has an impairment or combination of impairments which meet or equal an impairment found in the Listing of Impairments. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App. I. A claimant seeking disability benefits bears the burden of proving that his condition meets or equals a listed impairment. *Ribaudo v. Barnhart,* 458 F.3d 580, 583 (7th Cir. 2006). An ALJ's failure to mention the specific listing or listings being considered by name, combined with a perfunctory analysis, may require a remand. *Ribaudo,* 458 F.3d at 583; *Rice v. Barnhart,* 384 F.3d 363, 370 (7th Cir. 2004). The ALJ commits reversible error if he fails to discuss a specific listing or provide a thorough analysis if there is conflicting evidence about whether the claimant meets a specific Listing. *Rice,* 384 F.3d at 370.

In this case, the ALJ did describe the Listing for peripheral neuropathy by name and then explained over the course of a paragraph why the medical evidence did not show that Plaintiff had "disorganization of motor function in two extremities that cause an extreme limitation to stand up from a seated position, balance while standing or walking, or use his upper extremities." (R. 18.) Moreover, the ALJ noted that "alternatively, he did not exhibit a marked limitation in physical functioning and one of the following: understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintaining pace or adapting or managing

---

concerned six weeks of physical therapy Plaintiff underwent after tendon release surgery in 2009 – four years before his alleged onset date. (R. 43-44.) The ALJ's incorrect statement that Plaintiff only attended physical therapy three times over that six-week period and not three times per week is harmless error both because of the attenuated timeframe and also because there is no evidence that this surgery was related to Plaintiff's peripheral neuropathy.

11

oneself." (*Id.*) The ALJ did not consider whether Plaintiff met the Listing for depression or bi-polar disorder because she concluded – after evaluating the Paragraph B criteria – that the evidence failed to show that Plaintiff's mental impairments were severe, and thus never reached the question of whether they met a Listing.[9]

We find that the ALJ more than adequately determined that Plaintiff's impairments did not meet a Listing. No medical professional concluded otherwise anywhere in the record, and the Plaintiff's mere recitation of the standards for meeting the Listings and then his conclusory allegation that the evidence meets these standards is not adequate to meet his burden that the Listing criteria was met. *Maggard v. Apfel,* 167 F.3d 376, 379 (7th Cir. 1999).

### B. Analysis of the Medical Opinions

Plaintiff's argument that the ALJ handpicked which opinion evidence to consider and disregarded other evidence is not well taken. (Pl. Mem. at 9.) There are three opinions in the record,[10] and Plaintiff's primary argument is that the ALJ erred by not giving the opinion of PA Martin controlling weight as a treating physician. Generally, as long as a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with other substantial evidence" in the case record, the ALJ

---

[9] Although the ALJ never reached the issue, we note that there is no medical documentation that Plaintiff had depressive disorder characterized by at least five of the symptoms listed in Section 12.04(A) of the Listings. Plaintiff contends that medical records and his own testimony establish depressed mood, observable psychomotor retardation, decreased energy, feelings of worthlessness, and difficulty concentrating. However, while a consultative psychiatric examiner did diagnose Plaintiff with moderate depressive disorder and did note mild psychomotor retardation, there is no documented medical evidence of the remaining three criteria and in fact, the ALJ noted that Plaintiff stated in a disability application that he was able to "pay attention for hours." (R. 19.) Moreover, there is no evidence that Plaintiff had any extreme or marked limitations in the Paragraph B criteria, which is the second requirement for meeting a Listing for depressive and bi-polar disorder.

[10] Plaintiff complains that the ALJ erred by not assigning weight to the reports by two consultative Agency examining doctors. (Pl. Mem. at 10.) But neither of these examination records contains an opinion and thus they do not need to be assigned a "weight." *Horr v. Berryhill,* 743 Fed.App'x. 16, 20 (7th Cir. 2018).

should give it controlling weight. *Id.;* S.S.R. 96–2p; see *Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir. 2008). But even assuming that Martin, a physician's assistant, should be considered a "treating source," we find that the ALJ's decision to give his opinion little weight on the ground that the medical evidence did not support such a restrictive RFC is supported by substantial evidence.

Plaintiff argues that the ALJ ignored evidence supporting the severity of his impairments (and therefore, we infer, evidence to support PA Martin's RFC), but does not identify what that evidence is, other than to say that it includes "comments and opinions from treating sources." (Pl. Mem. at 10.) But that argument is circular; it is not proof that the ALJ ignored evidence in support of PA Martin's opinion by pointing to – PA Martin's opinion.  In essence, Plaintiff's argument is again little more than a disagreement with the weight the ALJ gave the medical evidence that contradicted the restrictiveness of the opinion, and it is not the task of the Court to reweigh evidence. *Wagner v. Berryhill,* 920 F.3d 1146, 1152 (7th Cir. 2019).

And while it is true that the ALJ did not specifically consider the factors in 20 C.F.R. 404.1527(c) for evaluating what weight to give a treater when not giving his or her opinion controlling weight, we find this error harmless. Consideration of these factors does not lend strength to the weight of PA Martin's opinion; in fact, it arguably weakens it.  Specifically, the length of Plaintiff's treatment relationship with PA Martin was short; the medical record shows only two appointments – both in February 2017 – before Martin completed the RFC opinion in September 2017.  The nature of the treatment relationship was described as "preventative medicine" and "office visit," and there is no indication that PA Martin specialized in either diabetes or peripheral neuropathy. Instead, he performed what appeared to be a general physical examination, and then referred Plaintiff for mental health services.

13

Moreover, PA Martin's own treatment notes do not support his later, extreme, RFC. To the extent Plaintiff's neuropathy is mentioned at all, it is to note that Plaintiff complained of "needles shooting" through his hands and feet, for which PA Martin continue to prescribe the pain medication Gabapentin. (R. 661-2.) Nowhere do his treatment notes suggest a more severe impairment or the need for greater treatment. Therefore, we find no error in the ALJ's decision to give PA Martin's September 2017 RFC little weight.

In addition to rejecting PA Martin's opinion, the ALJ also gave little weight to the two by non-examining Commission doctors because they opined that Plaintiff did not have any severe impairments, and the ALJ found that Plaintiff's neuropathy was severe enough to affect his ability to work. Plaintiff argues that by rejecting all of the medical opinions in the record the ALJ created an evidentiary deficit that failed to support her RFC determination. *Suide v. Astrue*, 371 Fed.App'x. 684, 690 (7th Cir. 2010). But where an ALJ determines an RFC that is more restrictive than a medical opinion, that RFC is not error as long as it is supported by medical evidence. *Ivair M. v. Berryhill,* No. 18 C 3884, 2019 WL 2085139 at *3 (N.D. Ill. May 13, 2019) (finding that RFC was supported by medical opinion where RFC was more restrictive than medical opinion.)

In this case, after giving little weight to the opinions of the Agency doctors that Plaintiff was not disabled (and thus, had no limitations on his ability to work), the ALJ determined that Plaintiff's neuropathy did affect his ability to perform his previous heavy work, but that Plaintiff's neuropathy did not prevent him from performing work at the medium level of exertion. Specifically, the ALJ's evidence included examination records that found Plaintiff had normal grip strength, gait and range of motion, recognition of his inconsistent treatment and failure to adhere to diabetes medication, his ability to perform most ADLs, and the fact that pain medication relieved his symptoms in 10-15 minutes. Notably, although some of Plaintiff's treatment records diagnose

14

him with peripheral neuropathy, none of them identifies abnormal medical tests or examination results beyond a single positive straight leg test in April 2013. Plaintiff does not point to any evidence to support greater restrictions on his ability to work.[11]

### C. PLAINTIFF'S LOSS OF INSURANCE

Finally, the ALJ's failure to question Plaintiff about how his loss of insurance affected his lapse in treatment is not error. It is true that in some cases, an ALJ cannot base a credibility determination on a claimant's failure to seek treatment without questioning him about how that failure was affected by lack of insurance. *Roddy v. Astrue,* 705 F.3d 631, 638 (7th Cir. 2013). But in this case, there is no evidence that Plaintiff's switch to Affordable Care Act public insurance in 2014 affected his ability to obtain treatment for his neuropathy or depression. To the extent Plaintiff raised the issue of his loss of insurance, he testified only that he was unable to continue with EMG testing for back pain. There is no evidence that his treatment for his diabetes or neuropathy stopped because of a lack of insurance or that he was unable to obtain pain or diabetes medication, which was the only treatment Plaintiff was ever prescribed.[12] Additionally, the ALJ specifically noted that Plaintiff was non-compliant with his treatment throughout 2013 – the time when he did have "good" insurance.

Although Plaintiff also argues in his brief that his loss of insurance affected his ability to obtain treatment for his depression, there is simply no evidence in the record to support such a

---

[11] We recognize that in one section of the opinion, the ALJ makes the statement that Plaintiff's neuropathy did not become severe until 2017, when he began to complain of pain, even though elsewhere the ALJ acknowledges that Plaintiff complained of pain in 2013. This error is harmless because it is undisputed that the ALJ accounted for all of Plaintiff's pre-2017 complaints and medical evidence.

[12] In fact, Plaintiff obtained medical treatment for a toothache in July 2016, during a time when he alleges that his public insurance wasn't being accepted. And as noted above, he also apparently obtained treatment from the 11th Street Clinic in 2014, although the illegibility of the treatment notes makes it impossible to determine exactly what that treatment was.

claim. Notes from the 2015 psychiatric consultative examination state only that Plaintiff reported seeing a psychiatrist and being prescribed medication for depression in 2010, and that he only took the medication for a few months. (R. 542.) Plaintiff's mental health was assessed every time he sought treatment for a physical ailment or impairment and was always normal. He testified at the hearing that he was depressed because of his inability to work, which was consistent with the consultative psychiatric evaluation he underwent in 2015. Beyond Plaintiff's statements to the consultative examiner, there is no evidence in the record that Plaintiff sought mental health treatment or was unable to obtain it because of a lack of insurance. Therefore, the ALJ did not err by failing to more fully develop the record with respect to Plaintiff's mental health. *Skinner v. Astrue,* 478 F.3d 836, 844 (7th Cir. 2007) (Mere fact that medical record contained little objective evidence of disability did not require ALJ to obtain additional evidence to more fully develop the record.)

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (D.E. 15) is denied, and the Commissioner's motion for summary judgment (D.E. 23) is granted. This case is terminated.

**IT IS SO ORDERED.**

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: January 7, 2022**